**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CSMG TECHNOLOGIES, INC., | § | |
| f/k/a CONSORTIUM SERVICE | § | |
| MANAGEMENT GROUP, INC., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:07-CV-0715 |
| | § | |
| GORDON W. ALLISON | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff CSMG Technologies, Inc. ("CSMG") filed this suit against Defendant

Gordon Allison, a co-founder and former executive of CSMG, alleging breach of

contract, fraud, and other causes of action.  Allison filed various counterclaims against

CSMG.  On September 30, 2008, after full briefing and oral argument, the Court

granted partial summary judgment dismissing Plaintiff's claims for negligent

misrepresentation and breach of contract, and further holding that Allison is entitled

to collect on his Promissory Note.[1]

The parties now have filed cross-motions for summary judgment.  Plaintiff

CSMG has filed a summary judgment motion on all of Defendant's counterclaims

(fraud and fraud in the inducement, breach of the duty of good faith and fair dealing,

---

[1]     Memorandum and Order, entered Sept. 30, 2008 [Doc. # 69].

breach of fiduciary duty, and promissory estoppel).[2]  Defendant Allison has filed two

motions, one seeking summary judgment on all of Plaintiff's remaining claims (breach

of contract, promissory estoppel, quantum meruit, and fraud)[3] and the other seeking

summary judgment on three of Allison's counterclaims.[4]  The parties appeared before

the Court for oral argument on February 5, 2009.  Having now considered all the

parties' briefing, oral argument, applicable legal authorities, and all matters of record,

the Court concludes that Plaintiff's Motion [Doc. # 74] should be **granted**,

Defendant's Motion on Plaintiff's claims [Doc. # 72] should be **granted**, and that

Defendant's Motion on his counterclaims [Doc. # 73] should be **denied**.  Accordingly,

all pending claims are dismissed.

## I.    <u>BACKGROUND</u>

Many of the background facts relevant to the pending motions are set forth in

---

[2]    Plaintiff CSMG Technologies, Inc's Motion for Summary Judgment on Breach of Contract, Promissory Estoppel, Quantum Meruit, Fraud and Fraudulent Inducement Claims [Doc. # 74].  Defendant filed a response.  *See* Doc. # 77.

[3]    Defendant's Motion for Summary Judgment on Plaintiff's Claims of Fraud, Fraud in the Inducement, Breach of Duty of Good Faith and Fair Dealing, Breach of Fiduciary Duty, and Promissory Estoppel and Brief in Support [Doc. # 72].  Plaintiff has responded and Defendant replied.  *See* Docs. # 79, 81.

[4]    Defendant's Motion for Summary Judgment on Counter Claims for Breach of Contract, Promissory Estoppel, and Quantum Meruit and Brief in Support [Doc. # 73].  Plaintiff has responded and Defendant replied.  *See* Docs. # 78, 82.  After Plaintiff filed a surreply, *see* Doc. # 84, Defendant was permitted to respond.  *See* Doc. # 87.

the Court's previous Memorandum and Order.  In brief, Defendant Gordon Allison, along with Don Robbins, co-founded CSMG in 1992.  Robbins is the current president and Chief Executive Officer of CSMG.  Defendant previously held positions as CSMG's Chief Financial Officer, Executive Vice President, and Secretary of CSMG, and was a member of CSMG's Board of Directors.  Among other things, he had responsibility for running Anaerobic Farm Waste, Inc. ("AFW"), a subsidiary of CSMG.

In 2003 and 2004 Allison, on behalf of CSMG, pursued a business opportunity regarding low-income housing outside the United States.  Specifically, Allison hoped to involve United Engineering Company ("UEC"), a CSMG subsidiary, with the housing venture, and was working with a person named C.T. Stanley to secure funding for the project.  On October 3, 2003, Allison wrote a letter to Vladlen Guzhva of UEC discussing the project, in which he stated that "the people that CSMG is working with would like to involve UEC in manufacturing and shipping to the markets they have in hand," that "[t]he funding is available for UEC to start-up the project," and that the project will be "very profitable for UEC."[5]  Plaintiff's fraud claim relies heavily on this letter as the source of Allison's promises and representations regarding the housing venture.

---

[5]     Exhibit 7 to Robbins Deposition (Exhibit A to Doc. # 72).

On November 5, 2003, as compensation for Allison's services, CSMG executed and delivered to Allison a Promissory Note for $254,000.[6]   The Court's previous M&O granted summary judgment for Allison on the Note.[7]   CSMG  executed the Promissory Note despite Robbins' specific, documented concerns about Allison's job performance.[8]

On July 14, 2004, the CSMG Board of Directors held a meeting in order for Allison to explain to Board members the potential arrangement between UEC and Stanley.[9]   The minutes reflect that the Board approved the continuation of the arrangement between UEC and Stanley, but provide no specifics about how the venture was to proceed.[10]

Approximately six weeks later, on August 28, 2004, Robbins wrote a second letter to Allison complaining of his performance and conduct, and expressing concerns

---

[6]     Promissory Note dated November 5, 2003 (Exhibit B to Doc. # 37) ("Promissory Note").

[7]     Doc. # 69.

[8]     In August 2003, Robbins wrote to Defendant and complained about Defendant's performance, specifically raising questions about alleged misrepresentations regarding funding and failure to adequately raise capital for CSMG.  Letter from Don Robbins to Gordon Allison, dated August 7, 2003 (Exhibit C to Doc. # 38) ("2003 Letter").

[9]     Minutes, CSMG Board of Directors Meeting, July 14, 2004 (Exhibit A to Doc. # 79) ("2004 Minutes"), at 1.

[10]    *Id*. (Board votes unanimously to "approve Stanley to continue with the UEC arrangement that UEC agrees on.")

that CSMG had not been adequately informed of Allison's personal relationships with or financial interests in persons or entities with whom CSMG was conducting business.[11]  Robbins' letter specifically mentioned C.T. Stanley and UEC's Guzhva.

On January 5, 2005, CSMG's Board met and agreed to parts of a proposal by Allison.[12]  As held in the previous M&O, the agreement reflected in the minutes ("2005 Agreement") modifies the payment terms on the Promissory Note.  The parties agreed that Allison would expend his efforts exclusively on AFW.  In addition, the parties agreed that Allison's annual salary of $150,000 would cease; that Allison would resign his positions as Executive Vice-President, Secretary and Chief Financial Officer of both CSMG and Live Tissue Connect, Inc.; that Allison would continue as President, COO and Director of AFW; and that Allison would continue as a Board member of CSMG.[13]

On January 3, 2007, CSMG held both a shareholders' meeting and a Board

---

[11]     Letter from Donald S. Robbins to Gordon Allison, dated August 28, 2004 (Exhibit D to Doc. # 38) ("2004 Letter").

[12]     Minutes, CSMG Board of Directors Meeting, January 5, 2005 (Exhibit G to Doc. # 77) ("2005 Agreement").

[13]     *Id.*  Eight months later, on August 5, 2005, Allison permanently resigned his positions in Live Tissue Connect LLC, which included Executive Vice President, Financial Officer, and Director; his positions as Vice President, Secretary, and Treasurer of Gas-Tech LLC; and his position as Secretary of CSMG.  Memorandum from Gordon W. Allison to CSMG Board of Directors, dated August 5, 2005 (Exhibit F to Doc # 37).  However, he retained his position as a Director of CSMG, and his positions as President and Director of AFW.  *Id.*

meeting.[14]  Allison's Board membership was not renewed.  At the Board meeting, the

Board members (Don Robbins, Esmeralda Robbins, Conrad Derdeyn, Bob Machen,

and Bruce Jones) were each awarded company stock as compensation "for the current

year of service."[15]

Several weeks after his Board membership was terminated, Allison, through

counsel, wrote to CSMG and attempted to exercise his options to purchase 525,000

shares of company stock by applying the outstanding balance on his Promissory

Note.[16] CSMG, through counsel, denied Allison's request on February 28, 2007.[17]  On

the same day, CSMG filed the instant lawsuit.

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who

fails to make a sufficient showing of the existence of an element essential to the

---

[14]    Minutes of CSMG Board of Directors Meeting of January 3, 2007 (Exhibit B to
Doc. # 73) ("2007 Minutes").

[15]    *Id.*

[16]    Letter from Mark R. Paisley, counsel for Allison, to CSMG, dated January 29, 2007
("Demand Letter") (Exhibit 17 to Robbins Deposition (Exhibit A to Doc. # 72)).
These options had been issued to Allison in 2000 and 2003.  *See* Exhibits A, B, & C
to Doc. # 87 (three options totaling 525,000 shares issued to Allison).

[17]    Letter from David W. Waddell, counsel for CSMG, to Mark R. Paisley, counsel for
Allison, dated February 28, 2007 ("Denial Letter") (Exhibit D to Doc. # 84).

party's case, and on which that party will bear the burden at trial.[18]   Summary

judgment "should be rendered if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."[19]

For summary judgment, the initial burden falls on the movant to identify areas

essential to the non-movant's claim in which there is an "absence of a genuine issue

of material fact."[20]   The moving party, however, need not negate the elements of the

non-movant's case.[21]   The moving party may meet its burden by pointing out "the

absence of evidence supporting the nonmoving party's case."[22]

If the moving party meets its initial burden, the non-movant must go beyond the

pleadings and designate specific facts showing that there is a genuine issue of material

fact for trial.[23]   "An issue is material if its resolution could affect the outcome of the

---

[18]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[19]   FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

[20]   *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

[21]   *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

[22]   *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (internal citations and quotations omitted).

[23]   *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal (continued...)

action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[24]

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.[25]  However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'"[26]  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.[27]  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.[28]  Instead, the nonmoving party must present specific facts which show "the existence of a genuine

---

[23]    (...continued)
        citation omitted).

[24]    *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

[25]    *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

[26]    *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)).

[27]    *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002).

[28]    *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

issue concerning every essential component of its case."[29]  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.[30]

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.[31]   A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.[32]

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[33]

## III.   **ANALYSIS**

---

[29]   *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).

[30]   *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

[31]   *See* Fed. R. Civ. P. 56(e); *Love v. Nat'l Medical Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).

[32]   *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

[33]   *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (internal citations and quotations omitted).

A.    **Plaintiff's Claims**

Defendant Allison seeks summary judgment on all of Plaintiff's remaining claims: fraud and fraud in the inducement, breach of the duty of good faith and fair dealing, breach of fiduciary duty, and promissory estoppel.

### 1.    Fraud and Fraud in the Inducement

Plaintiff CSMG brings a fraud claim complaining that Allison falsely represented to CSMG that C.T. Stanley would provide the funding necessary to proceed with the UEC venture involving low-cost modular housing, that Allison misrepresented Stanley's credentials, and that Allison misrepresented his personal financial interest in the venture.

Under Texas law, the elements of fraud are: (1) a material representation was made; (2) the representation was false; (3) the speaker either knew it was false when made, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.[34]

At oral argument, when asked by the Court to identify the allegedly false representations made by Defendant, Plaintiff directed the Court to two documents:

---

[34]    *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

(1)     The October 3, 2003, letter from Allison to Guzhva,[35] in which Allison discusses the market for low-income housing in third world countries, and states "the people that CSMG is working with would like to involve UEC in manufacturing and shipping to ***the markets they have in hand***. The ***funding is available*** for UEC to start-up the project."   Allison further states that the project will be "very profitable for UEC." Don Robbins, President of CSMG, is copied on the letter, and the last sentence states "All this has been discussed thoroughly with Mr. Don Robbins."

(2)     The minutes of the July 14, 2004 Board meeting, prepared by Allison.[36] The Minutes reflect that Allison briefed the Board on the UEC venture, discussed his plans to establish a new company owned 50% by Stanley and 50% by UEC, and informed the Board that "Stanley is working with several Third World Countries and the market looks real large."[37]

Plaintiff's fraud claim fails on several required elements.  First, Plaintiff has not demonstrated a genuine fact issue that material representations were made, as required by the first element.  Plaintiff's evidence regarding Allison's false statements about the availability of funding, as recited above, is insufficient.  Allison's statements in his 2003 letter to Guzhva concerned a project in its early stages, which never came to culmination.  To the extent statements in the letter could be deemed "representations" at all, they were puffery and salesmanship, as Allison clearly was trying to persuade

---

[35]     Exhibit 7 to Robbins Deposition (Exhibit A to Doc. # 72).

[36]     2004 Minutes (Exhibit A to Doc. # 79).

[37]     *Id.*

Guzhva to undertake the project.[38] The 2004 Minutes, although stating that the market "looked real large," made no representations regarding the availability of funding.[39]

Second, Plaintiff has presented no evidence that the statements were false when Allison made them. Allison testified at deposition that, at the time he wrote the letter, the project was at an early stage, that he was merely repeating what Stanley had told him, and no one could have known at the time whether the venture would ultimately be profitable.[40] There is no evidence in the record that Stanley did not have "markets in hand," or that the funding actually was not available. The fact that the venture never actually realized cannot establish that the alleged representations were false when made.[41]

Moreover, regarding the fifth required element, Plaintiff has not demonstrated

---

[38]   Exhibit 7 to Robbins Deposition (Exhibit A to Doc. # 72) (Allison refers to the "opportunity" in low cost housing, tells Guzhva that CSMG "would like to involve UEC" in the venture, assures Guzhva of Allison's assistance in making connections to Stanley and others, and invites Guzhva to come to Oklahoma City for negotiations with airfare paid by Stanley and lodging provided by Allison). *See Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) (mere "puffing" or opinion cannot constitute a fraudulent misrepresentation).

[39]   2004 Minutes (Exhibit A to Doc. # 79).

[40]   *See* Allison Deposition, Vol. II (Exhibit B to Doc. # 79), at 50-57.

[41]   *See Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986) ("[f]ailure to perform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made"). *See also Formosa*, 960 S.W.2d at 48 ("the mere failure to perform a contract is not evidence of fraud").

a genuine fact question that Plaintiff relied on the alleged representations.[42]  Robbins

testified at deposition that he had received representations regarding available funding

from Stanley (presumably referring to Allison's 2003 letter to Guzhva), that he wanted

and was seeking verification of the funding and had not received it but that,

nevertheless, Robbins and the entire Board voted to move forward with the UEC

venture on July 14, 2004.[43]  Robbins clearly was aware of the risks and uncertainties

when he cast his vote.

Finally, Plaintiff has not demonstrated a genuine fact question regarding

damages.  Plaintiff's claimed damages fall into two categories: (1) defensive damages

blocking Allison's counterclaim for fraud, by which Allison seeks to recover his

---

[42]  To the extent that Plaintiff continues to claim that Allison falsely represented that
Stanley possessed a degree from Harvard, this claim is unavailing.  This
representation, even if it were proven to have been made and to be false, cannot serve
as the basis for a fraud claim because there is no indication that CSMG acted in
reliance on Stanley's Harvard credentials when voting to proceed with the UEC
venture.

[43]  2004 Minutes; Robbins Deposition (Exhibit A to Doc. # 72), at 28-32.   Robbins
further stated at deposition that the Board did not change its position in 2004,
although Robbins continued to ask for verification and it was never provided by
Stanley or Allison.  *Id.*

The 2004 Minutes are unclear as to how the UEC venture was to proceed, stating
vaguely that the Board resolved "for CSMG to approve Stanley to continue with the
UEC arrangement that UEC agrees upon."   The Minutes also state that Stanley will
not finalize any agreements with UEC without the approval of CSMG.  In August
2004, just six weeks after the Board meeting, Robbins put in writing his concerns
about UEC, making allegations similar to those underlying Plaintiff's claims in this
lawsuit.

foregone salary for 2005 ($150,000) and unreimbursed expenses (estimated at $23,000);[44] and (2) CSMG's alleged losses of $112,072 on the sale of UEC.

Regarding Plaintiff's defensive argument on damages, seeking to block Allison's recovery for salary and unreimbursed expenses, this claim for damages is rendered moot by the Court's ruling herein dismissing Allison's counterclaim for fraud.

Regarding CSMG's alleged losses on the sale of UEC, Plaintiff's briefing provides no citation in support of its assertion that UEC was sold at a loss.[45] Allison's briefing, however, cites to Robbins' deposition testimony that Plaintiff sold UEC for a gain in the range of $140,000-$200,000.[46]  In the absence of any specific evidence from Plaintiff, the record reflects no genuine issue of material fact on this

---

[44]     Amended Counterclaim [Doc. # 61], at 20.

[45]     *See* Doc. # 79, at 6.  At oral argument Plaintiff's counsel referred to the Robbins Deposition which, as stated in the text above, contains testimony that CSMG sold UEC for a gain.  Plaintiff's counsel also referred to CSMG's 10K statement for 2007 but did not provide a record citation for the document, and the Court has not located the document in the record.  *See Malacara*, 353 F.3d at 405 ("[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment") (internal citations and quotations omitted).

[46]     See Doc. # 72 at 9; Robbins Deposition (Exhibit A to Doc. # 72), at 68-69 (CSMG sold its interest in UEC in 2007 for about $350,000 pre-tax ($288,000 post-tax); after the losses for the year, the gain reported by CSMG for the UEC sale was in the range of $140,000-$200,000).

point.

For all of the foregoing reasons, summary judgment for Defendant is granted on Plaintiff's fraud claim.

### 2.      Breach of Duty of Good Faith and Fair Dealing

Allison argues that Plaintiff's claim for breach of the duty of good faith and fair dealing is time barred under the two-year statute of limitations.[47]

The only damages asserted by Plaintiff on this claim are Allison's salary and expenses, as claimed in Allison's counterclaim for fraud.  Because Allison will collect nothing on his counterclaim, based on the Court's rulings herein, Plaintiff has no damages on this claim.  Summary judgment is granted for Defendant.[48]

### 3.      Breach of Fiduciary Duty

Plaintiff's entire briefing regarding breach of fiduciary duty reads as follows:

Based on the same facts and arguments stated in support of CSMG's claims for fraud, there are genuine issues of material [fact] with respect

---

[47]    *See Kitchell v. Aspen Exploration Inc*., 562 F. Supp. 2d 843, 855 (E.D. Tex. 2007) (two year limitations period).

[48]    For other reasons, the Court questions whether this claim is legally viable.  The facts pleaded in the complaint are the same relied upon in Plaintiff's claim for negligent misrepresentation, which the Court previously held time-barred under the two-year limitations period.  *See* Doc. # 69.  Moreover, Plaintiff alleges in its briefing that Allison made a mere inquiry to CSMG's auditor regarding a potential purchase of AFW; in order to prevail on this claim at trial, Plaintiff would need to establish that a mere inquiry is sufficient to establish breach of a duty of good faith or fair dealing. Moreover, no damages have been shown, as the Board rejected Allison's offer to purchase AFW.

> to CSMG's claims for breach of fiduciary duty and promissory estoppel. Allison breached his fiduciary duty to CSMG in making the enumerated misrepresentations and participating in conflicting roles in his unauthorized bid to obtain AFW.[49]

Under Texas law, the elements for a breach of fiduciary duty are: (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached his fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant.[50]

Plaintiff's counsel acknowledged at oral argument that the damages on this claim are purely defensive against Allison's claim for salary and expenses.[51]  As stated above, this claim for damages is mooted by the Court's ruling below dismissing

---

[49]     Doc. # 79, at 7.  As for CSMG's briefing on fraud, CSMG asserts as follows:

> Finally, CSMG has demonstrated that it suffered damages as a result of reliance on Allison's misrepresentations.  Though the Court ruled on the promissory note itself, this did not dispose of the damages CSMG suffered from the misrepresentations, including unpaid salary and expenses still claimed by Allison. Further, CSMG suffered a loss from the sale of UEC, and these damages are not merely speculative.

*Id.* at 6.

[50]     *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. – Dallas 2006, pet. denied)).

[51]     Plaintiff's damage theory on this claim, and others, was not apparent from the briefing.

Allison's counterclaim for fraud.[52]

Summary judgment in favor of Defendant is granted.

### 4.    Promissory Estoppel

According to Plaintiff's Second Amended Complaint, this claim also pertains

to Allison's alleged representation that he had secured funding for the UEC venture.

The elements of Plaintiff's claim for promissory estoppel are: (1) that Allison

made a promise; (2) foreseeability by Allison that CSMG would rely on the promise;

and (3) that CSMG suffered substantial detrimental reliance on Allison's promise.[53]

Texas courts have adopted the equitable doctrine of promissory estoppel as set forth

by the Restatement of Contracts:

> A promise which the promisor should reasonably expect to induce action
> or forebearance of a definite and substantial character on the part of the
> promisee and which does induce such action or forebearance is binding
> ***if injustice can be avoided only by enforcement of the promise***.[54]

Plaintiff's counsel conceded that damages for this claim are the same defensive

damages asserted for the previous claims; in other words, Plaintiff seeks only to

prevent Allison from collecting damages on his counterclaims.   This claim for

---

[52]    To the extent Plaintiff also claims losses from the sale of UEC as damages for this
claim, this argument also fails as held above.

[53]    *Hernandez v. UPS Supply Chain Solutions, Inc*., 496 F. Supp. 2d 778, 783-84 (W.D.
Tex. 2007).

[54]    *Fretz Constr. Co. v. S. Nat'l Bank of Houston*, 626 S.W.2d 478, 480 (Tex. 1981)
(quoting RESTATEMENT OF CONTRACTS § 90) (emphasis added).

damages is rendered moot by the Court's ruling on Allison's counterclaim for fraud.

Because Plaintiff has no damages resulting from any viable promissory estoppel theory, summary judgment is granted for Defendant.[55]

## B.   Defendant's Counterclaims

Defendant Allison brings counterclaims for breach of contract, promissory estoppel, quantum meruit, and fraud.  Both parties seek summary judgment as to breach of contract, promissory estoppel, and quantum meruit, and Plaintiff seeks summary judgment on Allison's fraud claim.

### 1.   Breach of Contract

Allison contends that CSMG breached a contract between the parties when CSMG denied Allison's attempt to exercise his option to purchase 525,000 shares of company stock.  CSMG issued Allison stock options on three occasions: (1) an option for 100,000 shares issued on Jan. 28, 2000; (2) an option for 200,000 shares issued on Sept. 25, 2000; and (3) an option for 225,000 shares issued on April 25, 2003.[56]

To prevail on a breach of contract claim, Allison must establish the existence

---

[55]   Plaintiff's promissory estoppel theory has other deficiencies apparent from this record.  For example, the Court questions whether Allison's statements regarding funding for UEC were a "promise," and whether CSMG has presented any evidence of "detrimental reliance" upon such "promise."  Given the holding above, however, the Court need not address these deficiencies.

[56]   *See* Exhibits A, B, & C to Doc. # 87.  Plaintiff's counsel stated at oral argument that Plaintiff does not contest that these options were awarded to Allison.

of a valid contract between himself and counter-defendant CSMG, the performance or tender of performance by Allison, a breach by CSMG, and damages as a result of that breach.[57]   The Court is to interpret the terms of an unambiguous contract as a matter of law.[58]   The contractual language "should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated."[59]   A court must determine whether a contract is ambiguous as a matter of law.[60]   Determining whether ambiguity exists, the court must look at the contract as a whole in light of the circumstances existing at the time of execution.[61]   The terms of a   contract   are   ambiguous   if   they   are   subject   to   two   or   more   reasonable

---

[57]   *E.g., Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003) (citing *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.—Houston [14th Dist.] 2000, no pet.)).

[58]   *Gonzales v. Denning,* 394 F.3d 388, 392 (5th Cir. 2004); *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999).

[59]   *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987*)* (citing *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)).

[60]   *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 428 (5th Cir. 2003); *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.*, 150 F.3d 526, 529 (5th Cir. 1998); *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995).

[61]   *Instone Travel*, 334 F.3d at 431 (citing *In re El Paso Refinery, LP*, 302 F.3d 343, 353 (5th Cir. 2002); *Exxon Corp. v. West Tex. Gathering Co.*, 868 S.W.2d 299, 302 (Tex. 1993).

interpretations.[62]  On the other hand, if the terms of the contract can be given a definite

or certain legal meaning, then the contract is not ambiguous.[63]

CSMG argues, citing to the parties' 1998 Stock Option Plan,[64] that Allison

failed to properly exercise his options because he did not make full payment within

90 days of the termination of his Board term.[65]  Allison did not tender cash or a

cashier's check, but instead attempted to use the unpaid installments due on the 2003

Promissory Note for the purchase.[66]  CSMG argues that, under the Stock Option Plan,

such form of payment is unacceptable unless approved by the Board.

Under both the 1998 and 2003 Stock Option Plans, Section 8.2 governs

consideration for the shares:

The consideration to be paid for the Shares to be issued upon exercise of

---

[62]   *Balandran v. Safeco Ins. Co.*, 972 S.W.2d 738, 741 (Tex. 1998).  *See Cicciarella v. Amica Mut. Ins. Co.*, 66 F.3d 764, 768 (5th Cir. 1995) ("A contract is ambiguous only 'when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning.'" (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983))).

[63]   *H.E. Butt*, 150 F.3d at 529; *Nat'l Fire Ins.*, 907 S.W.2d at 520.

[64]   1998 Stock Option Plan (Exhibit 19 to Robbins Deposition (Exhibit A to Doc. # 73)). The parties also have cited to CSMG's 2003 Stock Option Plan (Exhibit E to Doc. # 87), which Allison now argues governs his third option for 225,000 shares, issued in April 2003.  The relevant language is identical in the two Plans.

[65]   1998 Stock Option Plan, § 9.1 (optionee must exercise option within 90 days of termination). Section 9.1 of the 2003 Plan contains the same provision.

[66]   *See* Demand Letter ("purchase price [for the 525,000 shares] is hereby paid by offsetting that same amount from the monies that are due to Mr. Allison under the November 5, 2003 Promissory Note").

an Option may be paid by certified or cashier's check.  In the discretion of the Option Committee as set forth in the Option Agreement or, except for Incentive Options, determined at the time of exercise, payment may also be made by . . . promissory note . . . .[67]

Section 8.2's language carves out different treatment for Incentive Options and non-Incentive Options.  Allison agrees that his first two options were not Incentive Options.[68]  The Option Agreement for Allison's third option clearly states that the option is intended as an Incentive Option.[69]  However, as Allison concedes, to the extent that the value of the Incentive Option exceeds $100,000, the option will be treated as a non-Incentive Option.[70]

The Court first addresses the non-Incentive Options.  Allison argues that he is entitled to recover his options because CSMG "simply fail[ed] to act" upon Allison's Demand Letter exercising his options, that CSMG's inaction was impermissible under

---

[67]   1998 Stock Option Plan, §§ 8.2, 8.2.2; 2003 Stock Option Plan, §§8.2, 8.2.2.

[68]   Doc. # 87, at 3.

[69]   Stock Option Agreement between CSMG and Allison, dated May 8, 2003 (Exhibit D to Doc. # 87), at 1, § 2.

[70]   Doc. # 87, at 4.  The $100,000 limit is set by Section 5.2 of the 1998 and 2003 Stock Option Plans, which provides "to the extent that the aggregate Fair Market Value of the Shares with respect to which Options designated as Incentive Stock Options are exercisable for the first time by any Optionee during any calendar year (under all plans of the Company or any Parent or Subsidiary) exceeds $100,000, such excess Options shall be treated as Nonqualified Stock Options."

the Plan, and that the inaction amounts to breach.[71]  A premise for this argument is that

the CSMG Option Committee, or Board, is the entity that should take action.  Allison's

support for his claim that the Board failed to act is questionable.[72]  Nevertheless, even

assuming that such inaction could be proven, Allison has cited nothing in the Plan that

requires the Board to take specific action to deny an attempt to exercise stock

options.[73]  Contrary to Allison's argument, Section 4.5, entitled "Effect of Option

Committee's Decision" merely provides that "[a]ll decisions, determinations and

---

[71]    *See* Docs. # 82, # 87.

[72]    It appears likely, although the Court does not specifically find, that CSMG, though
counsel, did deny Allison's demand in writing.  *See* Denial Letter (Exhibit D to Doc.
# 84).   In the Denial Letter, CSMG disputes the validity of the debt and asserts that
his demand is insufficient to exercise the referenced options.  Allison argues that this
Denial Letter was not authorized by CSMG's Board, but merely issued by counsel at
Robbins' personal request, and insists that the Board "took no action" in response to
Allison's Demand Letter.  Allison cites to Machen's deposition testimony that he does
not recall ever being involved in a decision regarding exercise of options, and does
not recall the Board giving Robbins the authority to make decisions on options.
Machen Deposition (Exhibit E to Doc. # 77), at 81.  Allison also cites to Derdeyn's
deposition testimony that there was no Board decision to deny Allison the right to
exercise his stock options.  Derdeyn went on to state, however, that "[t]here was a
Board sort of discussion that if you are going to exercise options, you pay for them
. . . Machen and I come from large corporations and that's pretty much the standard
practice and we saw no reason why it wouldn't apply here."  Derdeyn Deposition
(Exhibit D to Doc. # 77), at 70.

[73]    Allison's cited case, *Dynacq Healthcare, Inc. v. Seth*, 2007 WL 2005023 (Tex. App.
– Houston [1st Dist.] 2007, pet. denied), does not hold that inaction by the Board
amounts to breach.  Rather, *Dynacq* upheld a lower court holding that a company with
an established "cashless" method of exercising options, which had been used by over
fifty employees, could not withhold approval when one employee attempted to use the
cashless method.

interpretations of the Option Committee shall be final and binding on all Optionees and any other holders of any Options."  Nothing in the provision, which is identical in the 1998 and 2003 Plans, either requires the Board to issue a decision within a certain time or states that the failure to issue a decision is equivalent to approval of the option holder's request.  Under Section 8.2, the Board must exercise its discretion in order to authorize payment by promissory note.[74]  The Board granted no such discretionary approval for Allison's options.  His argument that Board inaction can substitute for Board approval is wholly unsupported by the record.  Therefore, with regard to all non-Incentive Options, summary judgment for Plaintiff is warranted.

As for the Incentive Options, Allison makes an additional argument that Section 8.2 removes Incentive Options from the Board's discretion, and that his attempted payment by promissory note was automatically valid.[75]  Again, Section 8.2 provides as follows:

> The consideration to be paid for the Shares to be issued upon exercise of an Option may be paid by certified or cashier's check. In the discretion of the Option Committee as set forth in the Option Agreement **or**, *except for Incentive Options*, determined at the time of exercise, payment may

---

[74]     1998 Stock Option Plan, § 8.2; 2003 Stock Option Plan, § 8.2.  Both provisions state that, "In the discretion of the Option Committee  . . . payment may also be made by . . . promissory note . . .".

[75]     Doc. # 82, at 2 (Section 8 "clearly and unambiguously leaves the nature of consideration to be paid for the option to the option holder, not to the discretion of the Board").

also be made by . . . promissory note . . .[76]

The Court must give this contractual language "its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated."[77]

Section 8.2's first sentence sets forth a general rule:  Payment upon exercise of stock options may be made by certified or cashier's check.  The second sentence then provides that, under certain conditions, alternate methods of payment sometimes may be used.  The grammatical subject of the second sentence is "payment," and the sentence's verb is "made."  The sentence's sole independent clause is "payment may also be made by [various methods including] promissory note."   In the sentence's opening dependent clause, there are two alternative conditions (separated by the conjunction "or") regarding use of the alternate payment methods.  First, the Option Committee has discretion regarding payment methods, as set forth in the Option Agreement.[78]  Second, the method of payment may be determined at the time of exercise *except* in the case of Incentive Options.  Incentive Options, by the clause's express terms, are carved out from the alternative of circumstances involving "determin[ation] at the time of exercise."

---

[76]    1998 Stock Option Plan, §§ 8.2, 8.2.2 (emphasis added); 2003 Stock Option Plan, §§8.2, 8.2.2 (emphasis added).

[77]    *Reilly*, 727 S.W.2d at 529 (citing *Fox*, 398 S.W.2d at 92).

[78]    The Option Agreement pertaining to Allison's third option, for 225,000 shares, is provided as Exhibit D to Doc. # 87.

Even if there is some dispute as to aspects of the linguistic interpretation of Section 8.2 set forth above, Allison's construction fails. Allison contends he, as the option holder, had the sole discretion to tender an alternative form of payment for his Incentive Options. This interpretation is not supported by either the provision's plain language or by the grammatical structure of the sentence at issue. In order to read Section 8.2 to place sole discretion regarding payment method with the option holder for Incentive Options, as Allison argues, the phrase "except for Incentive Options" would have to be read to modify the sentence's opening phrase, "[i]n the discretion of the Option Committee." This interpretation is grammatically nonsensical, forcing together two non-adjacent phrases and rendering "or" superfluous. Moreover, even if the interpretation made grammatical sense, which it does not, nothing in the provision states that the *option holder*, rather than the Board, has sole discretion regarding payment method; at most, the provision is silent on that point.[79] The Court therefore concludes that Allison's interpretation regarding Incentive Options is not reasonable and, accordingly, holds that Section 8.2 is not ambiguous.[80]

---

[79] In fact, as noted above, Allison has made the contrary argument in his briefing before this Court. *See, e.g.*, Doc. # 82, at 3 (Allison argues that CSMG breached the Stock Option Plan by failing to act upon Allison's attempt to pay for his option by promissory note, and that the Board's failure to act was not within the Board's discretion).

[80] *See Balandran*, 972 S.W.2d at 741 (the terms of a contract are ambiguous if they are subject to "two or more reasonable interpretations").

Not only does the Court's interpretation make sense of the provision's plain language, but it also comports with Allison's contemporaneous interpretation of the language. Having worked with those who drafted the 2003 Stock Option Plan, Allison wrote and signed a letter to shareholders in preparation for the shareholders' meeting at which that Plan was approved.[81] The letter recommended approval of the 2003 Stock Option Plan and set forth the Plan's "material features," including the following:

> Consideration to be paid for shares to be issued upon exercise of an option. For incentive stock options, [payment is to be made by] certified or cashier's checks. For nonqualified stock options, in the discretion of the directors or the stock option committee [payment may be made by] . . . promissory note . . . .[82]

Allison's statement in his 2003 letter that Incentive Options must be paid for by certified or cashier's check flatly contradicts his current arguments that the method of payment for these options includes assignment to CSMG of promissory note installments and that this alternative is available at the sole discretion of the option holder. Rather, Allison's explanation in 2003 to the shareholders is supported by the Plan's language and comports with this Court's interpretation of the Plan.

The Court accordingly holds that, as a matter of law, Section 8.2 is not

---

[81]     CSMG Schedule 14A Proxy Statement, dated November 4, 2003 (Exhibit A to Doc. # 84).

[82]     *Id*. at 10, 12.

ambiguous in any material respect. The Plan does not grant sole discretion to the Incentive Option holder to determine the method of payment. Rather, Section 8.2 requires that an option holder pay for Incentive Options by certified or cashier's check. Because Allison did not tender such payment, his breach of contract claim fails.

Allison has not demonstrated a genuine issue of material fact regarding breach by Plaintiff of the parties' Stock Option Plans. Summary judgment therefore is granted for Plaintiff on Allison's breach of contract claim.

### 2.    Promissory Estoppel

Defendant's promissory estoppel claim pertains to Allison's option to purchase the same 525,000 shares of stock, and is brought in the alternative to his breach of contract claim.[83]

The elements of a claim for promissory estoppel in this case are: (1) that CSMG made a promise; (2) foreseeability by CSMG that Allison would rely on the promise; and (3) that Allison suffered substantial detrimental reliance on CSMG's promise.[84] As stated above, promissory estoppel is an equitable doctrine that applies solely when

---

[83]    Allison's counterclaim for promissory estoppel originally included allegations regarding the 2003 Promissory Note; the parties agree that this portion of the claim was rendered moot by the Court's previous Memorandum and Order.

[84]    *Hernandez*, 496 F. Supp. 2d at 783-84.

injustice can be avoided only by enforcement of a promise.[85]

Promissory estoppel is not applicable. As held above, Allison has not demonstrated a genuine fact question that CSMG breached the Stock Option Plan when it refused to accept the Promissory Note as payment for his options. There is, in other words, no evidence that CSMG failed to keep its promise, and thus no enforcement by the Court is necessary to avoid injustice. Moreover, it would be inequitable to allow Allison to prevail on this claim based on an interpretation of Section 8.2 of the Stock Option Plan that is directly contrary to Allison's interpretation in his 2003 letter to shareholders.[86]

Summary judgment is granted for Plaintiff on Allison's promissory estoppel claim.

### 3.    Quantum Meruit

Allison brings this counterclaim for quantum meruit seeking a stock award of 150,000 shares, apart from the 525,000 shares at issue in other counterclaims. Allison argues that, because other directors were awarded 150,000 shares on January 3, 2007,

---

[85]   *Fretz*, 626 S.W.2d at 480 (quoting RESTATEMENT OF CONTRACTS § 90) ("A promise which the promisor should reasonably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise.").

[86]   CSMG Schedule 14A Proxy Statement, dated November 4, 2003 (Exhibit A to Doc. # 84), at 10, 12.

and because he served as a director during 2006, he should have been given the same stock award.   Under Texas law, the elements of quantum meruit are: (1) valuable services were rendered; (2) for the person sought to be charged; (3) which were accepted and enjoyed; (4) under circumstances giving reasonable notice that compensation was expected for the services.[87]

Plaintiff argues that Allison was not entitled to the stock award because, when the awards were made to directors in January 2007, Allison was no longer a director. The uncontroverted record supports Plaintiff's argument.  On January 3, 2007, CSMG held both a shareholders' meeting and a Board meeting.  The minutes of the Board meeting reflect that the shareholders' meeting had already occurred and that the newly elected Board members did not include Allison.[88]  The minutes then state clearly that Board members should be compensated "for 2007" and that each member was to receive a stock award "for the current year of service."[89]

Allison's argument that the stock awards were for service in 2006 is flatly

---

[87]    *Infra-Pak (Dallas), Inc. v. Carlson Stapler & Shippers Supply, Inc.*, 803 F.2d 862, 865 (5th Cir. 1986) (citing *Bashara v. Baptist Mem'l Hosp. Sys.,* 685 S.W.2d 307, 310 (Tex.1985))

[88]    2007 Minutes (Exhibit B to Doc. # 73) ("This meeting followed the Shareholder's Meeting of the same date and all of the newly elected Board Members were present consisting of Donald S. Robbins, Esmerelda Robbins, Conrad Derdeyn, Bob Machen, and Bruce Jones.")

[89]    *Id*. (listing each Board member and the amount of shares awarded to each).

contradicted by the record on which he relies.  The minutes themselves, as quoted above, clearly refer to "2007" and the "current year of service," with no mention of 2006 or past service.  The deposition testimony of Board member Bob Machen, also cited by Allison, merely states that Machen received a stock award in January 2007 and that the stock awards "served as payment for the Board services."[90]

Summary judgment is granted for Plaintiff on Allison's quantum meruit claim.

### 4.    Fraud and Fraud in the Inducement

Allison alleges that CSMG committed fraud by misrepresenting its continued commitment to AFW, thereby inducing Allison to enter into the 2005 Agreement, resigning certain positions, and foregoing his annual salary.[91]  Allison also claims that he incurred unreimbursed expenses while developing AFW.  Plaintiff moves for summary judgment asserting that Allison has no evidence of fraud.

Under Texas law, the elements of fraud are: (1) a material representation was made; (2) the representation was false; (3) the speaker either knew it was false when made, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party

---

[90]    Machen Deposition (Exhibit F to Doc. # 77), at 33-34.

[91]    *See* 2005 Agreement (Exhibit G to Doc. # 77) (Allison resigns his positions as Executive Vice-President, Secretary, and Chief Financial Officer of CSMG to focus solely on AFW; Allison's salary of $150,000 ceases; Board will make regular monthly payments on Allison's Promissory Note).

was injured as a result.[92]

At the outset, the Court notes that the 2005 Agreement of which Allison now complains was Allison's own proposal. The Agreement itself reflects this fact, stating "[i]t was agreed to accept the proposal made by Allison" before going on to list the various agreements, including the cessation of Allison's annual salary, Allison's resignation of various positions with CSMG, CSMG's commitment to make monthly payments on the 2003 Promissory Note, and Allison's new focus on AFW.[93]

Allison now claims that he agreed to resign his positions with CSMG "in order to pursue a more lucrative commission compensation arrangement focused on AFW," and that when the parties entered into the 2005 Agreement "the Board failed to disclose to Allison that it did not intend to honor his [Promissory Note] in full and that its members, including Robbins and Mr. Derdeyn, did not believe AFW was viable."[94] In support, Allison cites deposition testimony of Robbins and Derdeyn.[95]

Defendant's evidence fails to establish a fact question regarding the first element of fraud, *i.e.*, a material representation. Allison has presented no evidence that CSMG represented to him that AFW was viable. In fact, in the only evidence

---

[92]    *Formosa*, 960 S.W.2d at 47.

[93]    2005 Agreement (Exhibit G to Doc. # 77).

[94]    Doc. # 77, at 9.

[95]    *Id.* (citing deposition testimony).

presented by Allison that is relevant on the point, Robbins specifically denied making

such a representation.   Under questioning by defense counsel, Robbins testified as

follows:

> A.   Individually, I didn't think AFW would make it.
>
> Q.   Why then did you offer—why did the company, if you know, offer this 6 percent commission deal to Mr. Allison?
>
> A.   We didn't offer it.  That was Allison's proposal.  We accepted his proposal.
>
> Q.   All right.  ***And you promoted to him that you thought the company was viable, though, at that point, didn't you?***
>
> * * * *
>
> A.   ***I didn't promote anything.***   Gordon [Allison] knew how I feel—felt about it.[96]

As Robbins' testimony and the rest of the record evidence suggests, Allison knew as

much as anyone else about AFW's viability or lack thereof.  In any event, Allison has

presented no evidence demonstrating a genuine issue of material fact that Plaintiff

---

[96]   Robbins Deposition (Exhibit C to Doc. # 77), at 28-29 (emphasis added). The other three deposition excerpts cited by Allison do not mention any relevant representation by CSMG.  *See* Robbins 30(b)(6) Deposition (Exhibit D to Doc. # 77), at 61 (Robbins testifies that AFW was moved to Corpus Christi in 2006 and that Allison was opposed to the move); Robbins Deposition (Exhibit C to Doc. # 77), at 13 (Robbins testifies that AFW was shut down by vote of the CSMG Board "at some point" because "it had not produced anything"); Derdeyn Deposition (Exhibit E to Doc. # 77), at 37 (Derdeyn testifies that he was "stupid" to put $7,500 of his money into AFW at the July 2004 Board meeting).

made representations to him regarding AFW's viability.

Allison's argument that "the business was **subsequently** discontinued and is now the subject of ridicule"[97] also is insufficient to defeat summary judgment. Texas law clearly requires that the evidence of intent to defraud "must be relevant to [the] intent at the time the representation was made," and that "the mere failure to perform a contract is not evidence of fraud."[98]

Summary judgment is granted for Plaintiff on Allison's fraud and fraud in the inducement claims.

## IV.   CONCLUSION

Based on the foregoing reasons, all pending claims are dismissed with prejudice. It is accordingly

**ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's Claims of Fraud, Fraud in the Inducement, Breach of Duty of Good Faith and Fair Dealing, Breach of Fiduciary Duty, and Promissory Estoppel and Brief in Support [Doc. # 72] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment on Counter Claims for Breach of Contract, Promissory Estoppel, and Quantum Meruit and Brief

---

[97]    Doc. # 77, at 9 (citing deposition testimony).

[98]    *Formosa*, 960 S.W.2d at 48 (citing *Schindler v. Austwell Farmers Coop.*, 841 S.W.2d 853, 854 (Tex. 1992); *Spoljaric*, 708 S.W.2d at 434).

in Support [Doc. # 73] is **DENIED**.  It is further

      **ORDERED** that Plaintiff CSMG Technologies, Inc's Motion for Summary Judgment on Breach of Contract, Promissory Estoppel, Quantum Meruit, Fraud and Fraudulent Inducement Claims [Doc. # 74] is **GRANTED**.  It is further

      **ORDERED** that, because all pending claims have now been fully and finally resolved by this Court, Defendant now is entitled to payment under the Court's previous order regarding the 2003 Promissory Note.  *See* Memorandum and Order [Doc. # 69].

      A separate final judgment will issue.

      SIGNED at Houston, Texas, this **27**[th] day of **February, 2009**.

Nancy F. Atlas
United States District Judge